# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF RHODE ISLAND

LINDA E.,
Individually and on behalf
of her daughter, S.E.
                    Plaintiffs,

v.                                          C.A. No. 10-129ML

BRISTOL WARREN
REGIONAL SCHOOL DISTRICT,
                    Defendant

**consolidated with**

BRISTOL WARREN
REGIONAL SCHOOL DISTRICT,
                    Plaintiff

v.                                          C.A. No. 10-132ML

LINDA E. as parent and legal
Guardian of SE,
                    Defendant

## AMENDED MEMORANDUM AND ORDER

The case before this Court involves the determination of eligibility for benefits pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. ("IDEA"). The Bristol Warren Regional School District (the "School") has appealed the Administrative Decision (the "Decision") of an Impartial Due Process Hearing Officer (the "Hearing Officer") which requires the School to provide its student, S.E., with (1) special education in a residential school placement, and (2) twenty-one weeks of compensatory education. Following the Hearing Officer's determination, S.E.'s mother, Linda E. (the "Parent), filed a

complaint in this Court to recover attorney's fees and costs as the prevailing party in a Due Process Hearing. On its part, the School filed an appeal of the Decision by the Hearing Officer pursuant to Section 1415 of the IDEA and Rhode Island General Laws Sections 16-24-1 et seq. and 42-35-15. The cases were consolidated and the matter is now before the Court on the parties' cross-motions for summary judgment on the complaints. For the reasons that follow, with respect to the School's appeal from the Hearing Officer's Decision, the Parent's motion for summary judgment is GRANTED and the School's motion for summary judgment is DENIED.

## I. Factual Background[1]

S.E. was born in 1993 and lives with her mother in Warren, Rhode Island. Since age 4, S.E. has demonstrated behavioral problems, including extreme rage, temper tantrums, and violent outbursts in response to circumstances in her environment. SSUF ¶ 1, PSUF ¶ 4. According to the Parent, S.E.'s anger was primarily directed at her mother and S.E. would, at times, "kick, spit, bite and punch her mother" and once threatened to stab her with a butter knife. PSUF ¶ 4.

---

[1]

The facts are taken from the Parent's Statement of Undisputed Facts ("PSUF") and the School's Statement of Undisputed Facts ("SSUF"), to the extent they are unchallenged, and from testimony and exhibits presented at the Hearing. The Court notes that, together, the parties have submitted nearly 300 facts regarding the background of this case. The facts have been summarized herein with a focus on those facts that appear most pertinent for an evaluation of S.E.'s need for particular educational services.

2

Beginning at age six, S.E. was taken by her mother to counseling by clinical social worker Denise Fragoza ("Fragoza") to address S.E.'s temper tantrums and out-of-control physical behavior. Hr'g Tr. I, 35:7-36:23. The counseling sessions ended when Fragoza recommended that the Parent file a wayward child petition[2] against S.E. at age ten and the Parent refused. Id. 60:17-61:23.

S.E.'s report cards from Kindergarten through grade 5 do not reflect any particular difficulties, SSUF ¶ 8, apart from noting in third grade that, at times, S.E. "tuned the teacher out," Res. Ex.[3] 7, and that she had difficulties in fifth grade in completing her homework. R. Ex. 9. In general, S.E. was progressing satisfactorily and was regularly promoted to grades 2, 3, 4, and 5. SSUF ¶¶ 9-12.

When S.E. was 8 years old, she was taken to the police station in a squad car after she "chased her mother through the house, pointing the sharp end of [a] steak knife at her" because the macaroni in her soup was not in her favorite shape. PSUF ¶ 7. On another occasion, S.E. held a knife up "to her own chest and threatened to stab herself if her mother did not get off the

_____

[2]

See R.I. Gen. Laws § 14-1-11.

[3]

The Administrative Record marks the Parent's exhibits as Petitioner's Exhibits (Pet. Ex.) and the School's exhibits as Respondent's Exhibits (Res. Ex.). For clarity's sake, the same naming convention will be continued herein.

3

telephone." PSUF ¶ 8. After she expressed a specific plan to kill herself, elementary school staff arranged for her to participate in a social skills group and have weekly meetings with a school psychologist or social worker. PSUF ¶ 9. A June 2002 neuropsychological evaluation of S.E. by Brett Leimkuhler, Ph.D. ("Leimkuhler") and Kathleen M. Rafuse Parnell, Ph.D. ("Rafuse Parnell") states that S.E. "was diagnosed with ODD [oppositional defiant disorder] by Dr. William Geary when she was 3 years old," and that "[f]rom 1999 to 2001 behavior therapy was undertaken." Pet. Ex. 1, at 1, 2. A questionnaire filled out by S.E.'s classroom teacher at that time showed that S.E. was in the "markedly atypical" range with respect to social problems, attention deficit hyperactive disorder ("ADHD"), and global restless/impulsive. PSUF ¶ 10, 11.

The Leimkuhler/Rafuse Parnell report notes that S.E.'s academic grades were good, but that "her behavior and social skills in school have been more of a problem this year." Pet. Ex. 1 at 2. According to the report, S.E. "presents a complicated clinical picture with elements of several disorders;" she "clearly meets the criteria for ODD in the home environment;" S.E.'s "combativeness, aggressiveness and physical cruelty" suggest a more serious conduct disorder; and her "clinical picture includes elements of a mood disorder and/or ADHD." Id. at 6. While S.E.'s "mood fluctuations are significant particularly at home, . . . they are beginning to

4

be observed at school as well." The report recommends that S.E. undergo a clinical psychological evaluation, followed by child psychiatric consultation and that she receive regular counseling with both cognitive therapy and behavioral management techniques. Id. at 6. With respect to S.E.'s schooling, the report states that, if ADHD is confirmed, S.E. "will require a 504 Plan[4] with appropriate classroom modifications, and resource services." Id.

Within weeks of the Leimkuhler/Rafuse Parnell report, S.E. underwent a psychological evaluation by clinical psychologist Judith Lubiner, Ph.D. ("Lubiner"). SSUF ¶ 6. Lubiner's report notes that, during the past school year, S.E. "has had difficulty understanding oral directions and containing her behavior;" she was punished several times for refusing to follow directions; and "[h]her social skills are a problem, and she does not have good friendships with other children." Id. Lubiner concluded that S.E. was depressed and suggested that S.E.'s "tantrums are related to her problems with self-control," which, in turn, "are probably related to Attention Deficit/Hyperactivity Disorder." Pet. Ex. 2 at 4. Based on Linda E.'s description of S.E.'s behavior as "cycling," Lubiner questioned whether S.E. suffered from bipolar disorder. Lubiner stated that "[b]ehaviorally, [S.E.'s] actions

_____

[4]

A 504 Plan is a plan affording certain accommodations pursuant to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a).

5

could indicate Bipolar Disorder. However, because there are usually clear triggers to her misbehavior, the combination of AD/HD and Major Depressive Disorder can account for her symptoms." _Id._. Lubiner's diagnosis of S.E. included major depressive disorder, AD/HD, problems in primary social group, and academic problems. Lubiner recommended that (1) S.E. see a pediatric psychiatrist "who can treat the complex set of symptoms that she presents;" (2) S.E. receive individual and family therapy; and (3) "[i]f a social skills group is available at her community mental health center, or at school, [S.E.] would benefit from this treatment modality." Pet. Ex. 2 at 5, SSUF ¶ 6.

According to the Parent, she provided the two reports to the School[5] "but was advised by school personnel that there was nothing the school could do to help." PSUF ¶ 15. From the third through the fifth grade, S.E. also received mental health services from Dr. Ethan Kisch ("Dr. Kisch"), a psychiatrist who had been recommended to the Parent by Leimkuhler's office. Dr. Kisch put S.E. on various medications, including lithium. Tr. Vol. I. 63:15-65:23.

In June 2005, at the end of fifth grade, S.E. moved out of her

---

5

The School states that it has no record of receiving these evaluations. SSUF ¶ 7. At the Hearing, the Parent testified that, at the beginning of third grade, she provided the reports to the elementary School S.E. was attending. Hr'g Tr. I 57:9-23. The Parent also recalled participating in a meeting at the elementary school with S.E.'s teachers, her guidance counselor, the school psychologist, and the principal and that these individuals had a copy of the reports. _Id._ 58:5-59:23.

mother's home to live with her father. SSUF ¶ 13. S.E.'s father insisted that Dr. Kisch take S.E. off her medications. SSUF ¶ 15, Tr. Vol. I. 66:24-67:5. S.E. moved back with her mother in March 2006 after alleging that her stepmother was abusing her. SSUF ¶ 14.

In sixth grade, the School documented some incidents of behavioral problems by S.E., including rudeness, disruptive behavior, and one incident of theft. PSUF ¶ 17. It was also discovered that S.E. was cutting herself in school. PSUF ¶ 18. The Parent arranged for CFIT (Child and Family Intensive Therapy) services which continued through seventh grade. PSUF ¶ 18, 22.

In January and March 2006, the School informed the Parent that S.E. was in serious danger of failing for the year. Pet. Ex. 8, 9. At the end of sixth grade, S.E. was getting Ds in language arts and science and she was failing math, although she passed her other classes. Res. Ex. 10. In April 2007, S.E.'s teacher notified the Parent that S.E. had been "inappropriate during class and disrupting the learning environment," for which she received two days' detention. Pet. Ex. 13. During that time, S.E.'s behavior resulted in police being called to the home repeatedly. PSUF ¶ 26. On those occasions, the police would transport S.E. to the police station and then to Hasbro Children's Hospital, where she would be kept for several hours and then be sent home. PSUF ¶ 28. After one such incident, the Parent filed a wayward child petition against her daughter. SSUF ¶ 17. As a result, the

Department for Children, Youth, and their Families ("DCYF") took S.E. into custody and, at first, placed her in a shelter, then, in a staff-secure facility, and finally, into a DCYF group home. PSUF ¶¶ 29, 30, SSUF ¶ 17. S.E. finished her seventh grade at Kickemuit Middle School and passed every subject. SSUF ¶¶ 17, 18.

After the Parent discovered that S.E. had stolen some items from a fellow student at her school, S.E. was charged in juvenile court for possession of stolen property and placed on probation. PSUF ¶ 31. According to the Parent, S.E. blamed the girl from whom she had taken the items, "often expressing threats to hurt her." PSUF ¶ 32. While living in the group home, S.E. attended public school in Newport, receiving passing grades, except for an F in English Language Arts and a "Not Met Standard" in Literature. PSUF ¶ 34.

Concerned with the threats S.E. had expressed against her fellow student, the Parent enrolled S.E. in parochial school when S.E. moved home and arranged for counseling at the East Bay Mental Health Center ("East Bay"). PSUF ¶ 35. S.E. completed eighth grade at Mt. Carmel, where she made some progress in all her subjects. The Mt. Carmel cumulative record indicates no areas of concern under effort, cooperation, respect, responsibility, or self-control. SSUF ¶¶ 24, 25.

Following her expulsion from a YMCA summer camp in 2008 after stealing a cell phone and physically attacking a counselor, S.E.

ingested a number of over-the-counter pills and was admitted to Bradley Children's Hospital ("Bradley"). PSUF ¶ 37, 38, SSUF ¶ 26. After a week on the locked ward, she was discharged to an acute residential treatment services ("ARTS") program. PSUF ¶ 39, SSUF ¶ 26. S.E. stayed at the ARTS facility until September 19, 2008, after which she began ninth grade at Mt. Hope High School ("Mt. Hope"). PSUF ¶ 43, 44, SSUF ¶ 27. Prior to her attendance there, the Parent informed S.E.'s guidance counselor of S.E.'s hospitalization at Bradley and subsequent placement at the ARTS program. PSUF ¶ 42, 43.

Within weeks of starting classes at Mt. Hope, S.E. was having difficulties; she fell asleep in her English class and did not complete her homework. Although S.E. agreed to stay after school and work with the English teacher on making up her work, she never followed through. PSUF ¶ 45. S.E. also had some disciplinary issues, SSUF ¶ 28, and received two days of office detention for being absent from class, Pet. Ex. 15, 17 - 19. In November 2008, S.E. received a progress report that showed she was failing all of her classes. SSUF ¶ 30, Pet. Ex. 20.

After East Bay staff observed that S.E. was again engaged in cutting behaviors and that she had increasing homicidal thoughts and difficulty managing aggression, S.E. was admitted to a Partial Hospitalization Program ("PHP") at East Bay for an intensive full day therapeutic program. PSUF ¶ 48-50, SSUF ¶ 27. The Parent

informed S.E.'s guidance counselor at Mt. Hope of S.E.'s admission to the PHP and requested that S.E. be provided with tutors. East Bay informed the School District that S.E. would be in the PHP Monday through Friday from 9:00 a.m. to 3:00 p.m. PSUF ¶ 52, 53. Pet. Ex. 27. East Bay sent a follow-up letter signed by S.E.'s treating psychiatrist Michael Wilberger, M.D. ("Dr. Wilberger"), which explained that S.E. was exhausted at the end of the daily program and that tutorial services "may be needed to support her academics," as she was unable to attend classes. PSUF ¶ 55, Pet. Ex. 28 at 1. The letter also included a "Diagnosis Page" that lists ODD and Mood Disorder under "Focus of Clinical Attention." Pet. Ex. 28 at 2.

According to Dr. Wilberger and Patricia Arel, Manager of the PHP, S.E. "exhibited an extremely high level of impulsivity and extremely inappropriate social behaviors . . . aggressive with peers . . . often short-tempered, irritable, and verbally abusive, swearing at others in a manner geared toward violence." PSUF ¶ 57. Escalations in S.E.'s behavior were often sudden and unexpected and "at times so severe that she had to be separated from others." PSUF ¶ 57. It is undisputed that during her time at the PHP from November 6 to December 3, 2008, S.E. received no academic instruction from the School or any other source. PSUF ¶ 58.

After East Bay staff informed the Parent that she could request special education services for S.E., the Parent wrote a

10

letter to School Special Services on November 28, 2008 and requested an IEP (Individualized Education Program). The Parent advised the School that S.E.'s mental health issues impacted her ability to maintain good grades, attention and focus, and that S.E. had missed school and was in need of tutoring. PSUF ¶ 61.

On December 4, 2008, S.E. was placed at Butler Hospital's Adolescent Unit ("Butler") after she attacked her mother physically. On that occasion, S.E. refused to agree to a safety plan and stated at the PHP that, "if she went home, she'd kill her mother." PSUF ¶ 63-65, SSUF ¶ 32, Hr'g Tr. III 85:7-15. S.E. also reported that the fights with her mother had become physical, but denied other stressors. SSUF ¶ 33. S.E. remained at Butler as an inpatient until March 17, 2009. While at Butler, S.E. participated in a school program provided by Education, Inc. for an hour and a half to two hours per day. SSUF ¶ 36. By December 24, 2008, the Parent was offered passes for S.E. to go home and work toward reintegration but the Parent refused. SSUF ¶ 37. On several occasions, S.E. stated that her anger and her aggression were directed at her mother. SSUF ¶ 38.

S.E.'s treating psychiatrist at Butler, Dawn Picotte, M.D. ("Dr. Picotte") expressed in a January 9, 2009 letter that, in her opinion,

> "[S.E.] requires ongoing treatment in a residential treatment setting that would provide a highly structured, cognitive behaviorally or dialectally behaviorally based program and psychopharmacotherapy with daily,

11

professionally administered clinical program throughout her waking hours that integrates academic instruction with an intensive integrated therapeutic component. This should provide a low student-teacher ratio and significant individualized attention to each student, with academics appropriate to [S.E.'s] cognitive abilities." Pet. Ex. 55 at 1.

Dr. Picotte noted further that S.E.'s clinical condition had deteriorated over the past two years and opined that "[b]ased on the severity and duration of illness, and lack of response to treatment," S.E. was "incapable of making reasonable academic or emotional progress in any setting other than residential placement at this time." Id. at 1, 2. SSUF ¶ 43.

In the interim, the Parent was exploring options for alternative academic services for her daughter. PSUF ¶ 71-73. On January 9, 2009, the Parent delivered Dr. Picotte's letter to the School. PSUF ¶ 85. At a "Referral Meeting" on January 26, 2009, the School first provided the Parent with a written description of the procedural rights of parents who believe their children have special needs. PSUF ¶¶ 86, 74. The School also informed the Parent that it required more information before determining S.E.'s eligibility and requested that S.E. be evaluated by Dana M. Osowiecki, Ph.D.,("Osowiecki"), a Clinical Child Neuropsychologist. SSUF ¶ 42. The Parent agreed to authorize the release of records from Butler, East Bay, the ARTS facility, and other prior treatment providers. PSUF ¶ 87. The Parent also agreed to an evaluation by Osowiecki to "identify [S.E.'s] cognitive strengths and

weaknesses, to assess her social, emotional, and behavioral functioning, and to offer recommendations for educational and treatment planning." PSUF ¶ 87, Pet. Ex. 56.

Osowiecki reviewed prior assessments of S.E. by Karen Holler, Ph.D., Lubiner, and Rafuse Parnell and Leimkuhler. She also noted her behavioral observations of S.E. and administered a number of tests related to academic achievement, sensory perceptual and motor functioning, auditory/verbal functioning, visual-spatial functioning, and attention. Osowieki concluded that S.E. "presents a complicated diagnostic picture," including ADHD, Conduct and Mood Disorders, Parent-Child Relational Problem, and a recently diagnosed Personality Disorder. Pet. Ex. 56 at 9, 10. In her summary, Osowiecki states that S.E. "will best respond in environments that provide external structure, clear expectations for performance, and consistent responses to her behavior" and that she "would benefit from accommodations and modifications to address her executive functioning difficulties and her emotional and behavioral needs as they impact academic functioning." Id. Osowiecki notes that "[w]herever [S.E.] goes to school, a plan would need to be put in place to address [her] ongoing emotional and behavioral issues with clear guidelines regarding how to address behavior, safety, and emotional functioning." This statement is followed by five pages of detailed recommendations to assist S.E. to address her social/emotional/behavioral issues and

13

to achieve academic success. Id. at 10-15.

Following Oswiecki's assessment, the School scheduled an "Eligibility Meeting" on March 11, 2009 to discuss whether S.E. was eligible for special education services. PSUF ¶ 104. Prior to the meeting, the Parent provided a letter from Dr. Wilberger to the School recommending residential placement for S.E. PSUF ¶ 105, SSUF ¶ 56. In the letter, Dr. Wilberger stated that even the intense full-time PHP S.E. received was insufficient "to maintain [S.E.'s] personal independent decision making in the face of her suicidal and homicidal ideation and her labile mood," or to help S.E. "master strategies for solving interpersonal conflicts without harming herself or others." Pet. Ex. 30. Dr. Wilberger concluded that, in order to make reasonable educational progress, S.E. needed a "highly structured therapeutic residential placement that will provide a consistent, daily, professionally-administered clinical programming throughout her waking hours." Id.

At the Eligibility Meeting, in addition to Osowiecki's report and Dr. Wilberger's letter, the School also had the benefit of reports by Rafuse Parnell/Leimkuhler and Lubiner, the ARTS facility records, reports by Drs. Picotte and Wilberger, neuropsychological reports of Karen Holler, Ph.D., as well as all of S.E.'s academic and disciplinary records. PSUF ¶ 108. The School discussed Osowiecki's evaluation and concluded that S.E. was not eligible for special education. SSUF ¶ 47. The School then issued an

"Evaluation Team Summary" that indicated, inter alia, that the School took the position that S.E. does not have a disability which adversely impacts school performance and requires special education services. PSUF ¶ 110 D, Pet. Ex. 67.

S.E. was released from Butler on March 17, 2009, SSUF ¶ 17, 2009, with a GAF (Global Assessment of Functioning) score of 45[6], which indicates "functioning in between major impairment in several areas and serious symptoms in several areas." PSUF ¶¶ 118, 119. It is undisputed that, while S.E. was an inpatient at Butler, the School paid for one-half to two hours per day of instruction that Butler arranged through a private agency; however, no grades or credits were recorded by the School for such instruction. PSUF ¶¶ 112, 115.

The School held a "Transition Meeting" on April 7, 2009, where it proposed that S.E. be placed at the East Bay Career Academy, a small alternative high school for students with behavioral or psychological problems, extreme depression, or school phobia. PSUF ¶¶ 124, 125. Although the Parent was of the opinion that S.E. required residential placement, she agreed to cooperate with the School's suggestion. PSUF ¶ 124.5, SSUF ¶ 64. On April 20, 2009, S.E. began attending East Bay Career Academy. PSUF ¶ 124.6, SSUF

---

[6]

GAF scores range from 1 - 100; a lower score indicates more serious impairment in functioning. At the Hearing, Dr. Wilberger explained that GAF classifies the severity of psychiatric disorders and that a score of 35 usually requires hospitalization or intensive residential care. Hr'g Tr. III, 90:12-18.

¶. It is undisputed that, prior to that date, S.E. had received no educational instruction since her discharge from Butler. PSUF ¶ 122. During her time at East Bay Career Academy, there were no unusual incidents similar to those described by the Parent. SSUF ¶ 66. According to a letter from the school's director, S.E. had three unexcused and four excused absences on the 15 days she attended the school, but, "when present, [S.E.] did her work and had overall good days." Pet. Ex. 49.

S.E.'s placement at the East Bay Career Academy was not successful. Within three weeks, she was admitted to East Bay Mental Health Center's Intensive Outpatient Program after she stole her grandfather's car and had an accident. PSUF ¶ 129, SSUF ¶ 67. On May 23, 2009, the School offered S.E. a place in the District's Extended Day Program.[7] PSUF ¶ 132. On May 28, 2009, the School held a "Resolution Conference" in connection with the Parent's request for an Impartial Due Process Hearing. PSUF ¶ 134. The School again determined that S.E. was not eligible for special education and proposed that she be found eligible for a 504 Plan. PSUF ¶135, SSUF ¶ 68.

As part of the 504 Plan, S.E. would come to Mt. Hope at 1:30 p.m. and work on her own by using an interactive computerized

---

[7]

According to Teacher Jessica Mazo, the Extended Day Program runs from 2:30 to 5:00 p.m. after each regular school day and involves helping students who have difficulties with subjects in which they are enrolled. Hr'g. Tr. IV 12:4-7, 12:25-13:8.

teaching program named PLATO, after which she would participate in the Extended Day Program. The plan was then revised to offer S.E. transportation from East Bay Mental Health to Mt. Hope. SSUF ¶ 69. The purpose of having S.E. participate in the Extended Day Program was to "get her back into the building, make her feel more comfortable, and to allow the staff to monitor her." SSUF ¶ 70.

S.E. attended the Extended Day Program from May 29 to June 19, 2009. PSUF ¶ 137. Following the end of the school year, the School enrolled S.E. in a 4-week "Freshman Credit Recovery Program," although S.E. did not meet the admission criteria. PSUF ¶¶ 143, 151. According to the school, the "credit program is not a full year of instruction" and was designed to provide students a foundation. SSUF ¶ 71. The intent behind enrolling S.E. in the credit recovery program was to "provide her a little bit of a support system or safety net and an opportunity for success as she transitioned back into high school." SSUF. ¶ 72. S.E. missed nearly 8 hours of class time, twice the permissible limit, but was given full credit for each of her four courses. PSUF ¶¶ 154 -156.

According to testimony by her teachers, S.E. was friendly toward her teacher in math class and toward other students. SSUF ¶ 74. Her social studies teacher described her as having a great attitude with other students and a pretty good relationship with the teacher. SSUF ¶ 77. Her science teacher reported that, on the second day of class, S.E. was texting in class and was suspended

for a day after she refused to turn over her cell phone and used inappropriate language. S.E. then returned after the suspension and completed a task that had been assigned. SSUF ¶ 78, Pet. Ex. 32.

Subsequently, the School enrolled S.E. in a "Survival Skills for High School" summer class. PSUF ¶ 159. Little information has been provided regarding this program, apart from S.E.'s "skipping 5.5 hours of the 10 hours of her Freshman Recovery English class." PSUF ¶ 161.

S.E.'s 2009-2010 school year was no more successful. She failed to turn in a number of biology homework assignments and her overall grade was a 63.[8] PSUF ¶ 167. S.E.'s overall grades in Algebra and American Literature were failing as well. PSUF ¶¶ 170, 171-173. The School made changes to S.E.'s 504 plan on October 9, 2010, which also involved assigning her to the School's "Planning Center" taught by special education teacher Michael Teves ("Teves") in a small group setting. PSUF ¶ 178-182. The Planning Center is a regular education resource available to all students and is designed to "service Students with social, emotional and academic needs." SSUF ¶ 92. According to the School, S.E. was assigned to the Planning Center because "she was playing catch-up" and "needed a small and quieter environment to stay focused and to get caught

_____

[8]

At Mt. Hope, a grade below 65 is considered failing. PSUF ¶ 166.

18

up." SSUF ¶¶ 93, 94.

Teves provided one-on-one instruction to students at the Planning Center, and S.E. also received individual instructions from some of her other teachers. PSUF ¶¶ 179, 184, 186. According to Teves, S.E. was "outstanding" in the Planning Center in that she was "[w]illing to work, ready to work, prepared." SSUF ¶ 96. It was Teves' belief that S.E. did not need specialized instruction. SSUF ¶ 97. Nevertheless, S.E. was still struggling and continued to fail biology. PSUF ¶ 187. During that time, S.E. also sought help from the school psychologist regarding events in her personal life that were upsetting her. PSUF ¶ 188.

On October 27, 2009, S.E. was assessed by her therapists at East Bay and was returned to the PHP for the 9:00 a.m. to 3:00 p.m. daily program. PSUF ¶ 189. The School again revised S.E.'s 504 Plan and arranged for her to attend the after-school Extended Day Program for one-on-one tutoring in her five core academic subjects. PSUF ¶ 194. The Parent proceeded with an Impartial Due Process hearing which took place between late July and early November 2009. PSUF ¶ 194.5. By the end of the hearings, S.E. was still attending the PHP full time, unable to attend school during the regular school day, and failing her academic courses. PSUF ¶ 195.

## II. Procedural History

The Parent first filed a request on May 11, 2009 for an Impartial Due Process Hearing to determine S.E.'s eligibility for

19

special education and to request placement at a residential school as well as compensatory educational services. Decision 3. The Rhode Island Department of Education appointed a Hearing Officer who conducted twelve days of hearings between July 28, 2009 and November 9, 2009. Decision 3-4. In the course of the hearings, the parties presented the testimony of 26 witnesses and 126 exhibits. Id. at 4. Following the hearings, the parties submitted trial briefs to the Hearing Officer. Id.

On February 23, 2010, the Hearing Officer issued a 12-page written opinion, holding that the "Student's Psychiatric Condition Constitutes Sufficient Emotional Disturbance to Warrant Special Education Needs and Related Services in a Residential School Placement." Decision 1. Specifically, the Hearing Officer determined that, in order to receive the Free Appropriate Public Education ("FAPE") required under the IDEA, S.E. needs "special education and related services in a residential school placement," which will also meet her "psychiatric and psychopharmacotherapy needs with a daily, professionally administered program." Decision 11, ¶ 4. The Hearing Officer also found that S.E. "lost substantial time in a proper academic program at no fault of the LEA [Local Education Agency]" and directed that S.E. receive twenty-one weeks of compensatory education. Id. at ¶ 5. Finally, the Hearing Officer determined that S.E. "did not receive FAPE in accordance with the IDEA" and Rhode Island law. Id. at ¶ 6.

On March 9, 2010, the School convened an Individual Education Plan ("IEP") meeting, which the Parent attended. The School then sent out referrals to three residential schools, including the F.L. Chamberlain School ("Chamberlain"), a therapeutic residential school licensed as a special educational facility in Middleboro, Massachusetts.

On March 17, 2010, the Parent filed a complaint against the School in this Court, seeking reimbursement of $77,370 in attorney's fees and costs she incurred in connection with the Due Process Hearing. On the same day, the School filed an appeal of the Hearing Officer's Decision on the grounds that the Decision was clearly erroneous and not supported by evidence on the record.

On April 28, 2010, S.E. began attending Chamberlain where she currently remains. On June 7, 2010, the School informed Chamberlain that it would be financially responsible for S.E.'s placement at Chamberlain only through June 21, 2010.

On June 21, 2010, the Parent filed motions for a temporary restraining order ("TRO") and preliminary injunction in the nature of "Stay-Put"[9] to prevent removal of S.E. from Chamberlain. After a conference with counsel for all parties on June 22, 2010, the Court granted the requested TRO. On July 9, 2010, the parties

---

[9]

Pursuant to Section 1415(j) of IDEA, during the pendency of an appeal, the student is to remain in then-current educational placement, unless the school and parents otherwise agree. 20 U.S.C. § 1414(j).

submitted a stipulated agreement for issuance of a preliminary injunction until this Court renders a decision on the parties' cross-motions for summary judgment regarding the School's appeal of the Hearing Officer's Decision.

On August 26, 2010, the parties submitted their respective motions for summary judgment, together with supporting memoranda and statements of undisputed facts.

On August 28, 2010, the parties stipulated their agreement to the following findings of the Hearing Officer:

1. The Student has met the necessary criteria to fulfill the IDEA's definition of a child with a disability under 20 USCA Section 1401(3)(A)(I) of emotional disturbance;

2. The Student has met the necessary criteria to fulfill the Rhode Island Regulations' definition under Section 300.7(A)(1) and under Section 300.7(C)4)(i)(c) and (d) of a child with a disability of emotional disturbance; and

3. Such emotional disturbance is such that it adversely affected this Student in her educational performance and this Student needs special education and related services by reason of this disability. August 26, 2010 Stipulation, Decision ¶¶ 1, 2, 3.

On September 15, 2010, the Parent submitted a response in opposition to the School's motion for summary judgment, together with a statement of disputed facts. Finally, on September 29, 2010, the School submitted a reply memorandum and a statement of disputed facts.

## III. Standard of Review

In reviewing an appeal from an administrative decision under IDEA, the Court accords "due deference" to the Hearing Officer's findings of fact and reviews the Hearing Officer's rulings of law under the IDEA framework de novo. <u>Abrahamson v. Hershman</u>, 701 F.2d 223, 230 (1st Cir. 1983)(courts must give "'due weight'" to state administrative agencies," but "ultimately must make 'independent decision[s] based on a preponderance of the evidence'"); <u>Ross v. Framingham Sch. Comm.</u>, 44 F.Supp.2d 104, 111-12 (D. Mass. 1999), aff'd 229 F.3d 1133 (1st Cir. 2000)(Court's review of hearing officer's findings is "appropriately 'thorough yet deferential'". . . Legal rulings are subject to nondeferential (or de novo) review."); <u>Slater v. Exeter-West Greenwich Reg'l Sch. Dist.</u>, 2007 WL 2067719 *2 (D.R.I., July 16, 2007). "[A]ny rulings about applicable law that are not in conformity with applicable statutes and precedents" are disregarded. <u>Ross v. Framingham Sch. Comm.</u>, 44 F.Supp.2d at 112. The First Circuit has described the applicable standard of review as "intermediate," requiring "a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete de novo review." <u>Rafferty v. Cranston Pub. Sch. Comm.</u>, 315 F.3d 21, 25 (1st Cir. 2002).

The Court is mindful that "[j]urists are not trained, practicing educators." <u>Roland M. v. Concord Sch. Comm.</u>, 910 F.2d

983, 989 (1st Cir. 1990); see Rafferty v. Cranston Pub. Sch. Comm., 315 F.3d at 25 ("While the court must recognize the expertise of an administrative agency, as well as that of school officials, and consider carefully administrative findings, the precise degree of deference due such a finding is ultimately 'left to the discretion of the [examining] court.'")(citations omitted).

When the parties choose not to submit additional evidence, "the motion for summary judgment is a procedural device through which the court decides the case on the basis of the administrative record." Cranston Sch. Dist. v. Q.D., 2008 WL 4145980 *5 (D.R.I., Sept. 8, 2008)(citing Bristol Warren Reg'l Sch. Comm. v. R.I. Dep't of Educ., 253 F.Supp.2d 236, 240 (D.R.I. 2003)); Slater v. Exeter-West Greenwich Reg'l Sch. Dist., 2007 WL 2067719 at *3 (if no additional materials are to be considered, the Court may "decide the case on the basis of the administrative record by way of a motion for summary judgment"). However, "[r]ather than considering the facts in the light most favorable to the non-moving party," the party "'challenging the outcome of the administrative decision'", here the School, "bears the burden of proof." Cranston School Dist. v. Q.D., 2008 WL 4145980 at * 5; Bristol Warren Reg'l Sch. Comm. v. R.I. Dep't of Educ. and Secondary Educs., 253 F.Supp.2d at 240.

The submitted administrative record consists of (1) the Hearing Officer's Decision, together with various stipulations and administrative documents submitted to the Hearing Officer, (2) the transcripts of the proceedings before the Hearing Officer, (3) the

parties' post-hearing briefs, and (4) the admitted exhibits, including nine exhibits expressly referred to and relied upon in the Hearing Officer's Decision. Those exhibits consist of three psychological or neuropsychological evaluation reports, Pet. Ex 1, 2, and 56; a letter confirming S.E.'s partial hospitalization at East Bay Center, Pet. Ex. 27; three letters from physicians at Butler Hospital and East Bay Center, where S.E. received mental health care services, Pet. Ex. 28, 30, and 55; and the curricula vitae of Dr. Wilberger and Dr. Picotte, Pet. Ex. 29 and 64, respectively. The parties have submitted no additional evidence.

## IV. Discussion

### A. The IDEA Statutory Framework

The purpose of the Individuals with Disabilities Education Act, 84 Stat. 175, as amended, 20 U.S.C. § 1400 et seq., is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C.§ 1400(d)(1)(A). <u>Winkelman ex. rel Winkelman v. Parma City School</u>, 550 U.S. 516, 538, 127 S.Ct. 1994, 2008, 167 L.Ed.2d 904 (2007).

The IDEA provides federal funding to the States, provided they "make a 'free appropriate public education' (FAPE) available to all children with disabilities residing in the State." <u>Forest Grove Sch. Dist. v. T.A.</u>, --U.S.--, 129 S.Ct. 2484, 2487-88, 174 L.Ed.2d

168 (2009). A FAPE "encompasses 'special education and related services,' . . . including 'specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability." <u>Mr. I. ex rel. L.I. v. Maine. Sch. Admin. Dist. No. 55</u>, 480 F.3d 1, 4 (1st Cir. 2007)(quoting 20 U.S.C. § 1401(9) and (29)). A child is eligible to receive special education and related services under the IDEA if the child qualifies as a "child with a disability." <u>Mr. I. ex rel. L.I. v. Maine. Sch. Admin. Dist. No. 55</u>, 480 F.3d at 4-5. A child who suffers from serious emotional disturbance and/or specific learning disabilities who "by reason thereof, needs special education and related services," qualifies under the IDEA as a child with a disability. <u>Id.</u>; 20 U.S.C. § 1401(3)(A).

The burden of identifying children with disabilities rests on each state. <u>Id.</u> at 5. A parent who is dissatisfied with "any matter relating to the identification, evaluation, or education placement of [her] child" or feels her child is not receiving a FAPE, may request an impartial due process hearing by the local educational authority ("LEA"). 20 U.S.C. § 1415(b)(6),(f)(1). <u>Rafferty v. Cranston Pub. Sch. Comm.</u>, 315 F.3d at 25. The findings and decision of the LEA can be appealed to the state educational agency, and, if the parent remains dissatisfied, he or she can bring a civil action in federal district court. <u>Id.</u>; 20 U.S.C. §1415(i)(2).

B.  The Hearing Officer's Decision

The Hearing Officer first determined that S.E. "lost most of the school academic year during the ninth grade" as a result of hospitalizations at Butler and participation in the East Bay PHP and that such loss was due to treatment of S.E. for "serious emotional disturbance." Decision 4.  That determination was supported by the Hearing Officer's review of the submitted medical and neuropsychological records and evaluations, including (1) the Leimkuhler/Parnell Report (Pet.  Ex. 1), (2) the Lubiner Report, (Pet.  Ex. 2), and (3) three reports from East Bay (Pet.  Ex. 27, 28, 30).  The Hearing Officer specifically lists the diagnoses set forth in those records and references particularly S.E.'s "frequent and violent outbreaks of rage, temper and harmful behavior" documented therein.  <u>Id.</u> at 5.

The Hearing Officer also quotes from the reports by Drs. Wilberger and Picotte, including the psychiatrists' opinion of the appropriate and necessary learning environment for S.E.  As noted in the Decision, Dr. Wilberger opined that S.E. requires "a highly structured therapeutic residential placement" without which "she would be unable to make reasonable educational progress."  <u>Id.</u> at 7.  Dr. Picotte agreed that S.E. "requires ongoing treatment in a residential treatment setting," noting that such setting would provide "a highly structured, cognitive behaviorally or dialectally behaviorally based program and psychopharmacotherapy with daily, professionally administered clinical program."  <u>Id.</u>

Next, the Hearing Officer reviewed the neuropsychological evaluation performed by clinical child and adolescent psychologist Osowiecki on behalf of the LEA. Although Osowiecki's report does not expressly state that S.E. requires a residential setting, the Hearing Officer notes that Osowiecki, along with Drs. Wilberger and Picotte, "arrived at the same position that the Student has serious psychiatric needs that must be attended in a highly structured setting . . ." Decision at 9.

The Hearing Officer determined and, as indicated by the parties' stipulation, the School now agrees, that S.E. qualifies as a "child with a disability" under the IDEA and Rhode Island Regulations who requires special education and related services. Id. The Hearing Officer also found the LEA's position that S.E.'s academic needs could be fulfilled at the LEA's public high school "not compatible" with the reports and testimony regarding S.E's psychiatric condition. Id. 9-10. He concluded that "based upon the psychiatric needs of [S.E.] . . . she needs a special education in a residential school placement in a separate facility whose special education program has been approved by the Rhode Island Commissioner of Elementary and Secondary Education and which facility shall also meet the psychiatric needs and psychopharmacotherapy needs with a daily professionally staffed clinical program." Id. at 10.

The final determination by the Hearing Officer relates to compensatory education for time lost by S.E. With respect to

28

S.E.'s participation in the East Bay PHP, the Hearing Officer notes that the LEA did not provide requested tutoring for a four-week period.  Id. at 6, 10.  S.E. also lost approximately 10 weeks of academic experience while hospitalized at Butler, an additional five weeks while she was participating at the East Bay PHP, and two weeks following that period until she was enrolled in the Extended Day Program.  Id. 10.  Based on these calculations and a finding that S.E. had not received a FAPE in accordance with the IDEA and Rhode Island Regulations, the Hearing Officer awarded to S.E. twenty-one weeks of compensatory education.  Id. 11-12.

C. The School's Appeal of the Hearing Officer's Decision

1.  Award of Therapeutic Residential Placement

As set forth in the stipulation by the parties, it is undisputed that S.E. is suffering from an emotional disturbance that adversely affects her in her educational performance and that she requires special education and related services because of her condition.  The issues that remain for determination are (1) whether, in order to provide S.E. with a FAPE, S.E. must be provided with therapeutic residential placement; and (2) whether S.E. is entitled to 21 weeks of compensatory education because she lost substantial time in a proper academic program.

With respect to the first issue, the School argues that the Hearing Officer's Decision should be overturned because he "did not provide well reasoned explanations for his determination that the Student needed a residential placement for educational reasons."

School's Mem. 15. Specifically, the School suggests that the Hearing Officer "did not explain why he accepted the opinion of providers rather than the educators when it came to the ability of the educators to provide a program for the Student." School Mem. 17.

Although the Decision does not specifically cite to the testimony and opinions of the educators, it is clear, and the Hearing Officer expressly states, that he considered such evidence. First, the Hearing Officer notes that, prior to issuing the Decision, he had the benefit of testimony by seven witnesses on the School's behalf, together with 24 full exhibits presented by the School. Decision 4. The Hearing Officer also observed that the School's position, as represented by "faculty and professional administrative staff," of what constitutes an appropriate educational environment for S.E., is "opposite" that taken by psychiatrists and psychologists regarding S.E.'s psychiatric needs to allow her to achieve her academic needs. Id. at 9-10.

The Hearing Officer's Decision notes particularly that Dr. Wilberger has nearly thirty years of experience in child psychiatry and that Dr. Picotte is a Board certified psychiatrist as well as the Unit Chief at the Adolescent Unit of Butler Hospital. Decision 7. Likewise, the Hearing Officer reviewed in detail the report and credentials of clinical psychologist Oswiecki, who had been engaged by the School to conduct an evaluation of S.E. while she was at Butler. Based on the entire body of submitted evidence and

30

testimony, the Hearing Officer arrived at the opinion that S.E.'s need for special education in a residential school placement was driven by her psychiatric needs.

The School now suggests that "the Student's problems are segregable from the learning process," because "all of the Student's problems occurred outside of the school setting," and that "[a]t no time did issues of an abnormal nature occur in the school setting." School Mem. 17. This statement is clearly inconsistent with the documentation submitted to the Hearing Officer and the undisputed facts submitted to this Court. As early as second grade, S.E.'s classroom teacher reported that S.E. seemed "unaware of her body [and on] numerous occasions she has pushed someone down with the movement of her body" and that she sometimes appeared "unconcerned about misbehaving." PSUF ¶ 12. S.E.'s disciplinary record from sixth grade reports incidents of rudeness, disruptive behavior, and theft. PSUF ¶ 17. At that time, it was also discovered by school personnel that S.E. was cutting herself in school. PSUF ¶ 18.

The record provided to the Hearing Officer documents in detail S.E.'s conduct in school and includes, inter alia, reports by the bus driver of S.E. "being out of control," Pet. Ex. 3; assignments to the focus room for disruptive behavior, Pet. Ex. 4, 5, 6, 7; Saturday detention notification for disruptive behavior for which S.E. had to be removed from assembly by the principal, Pet. Ex. 12; and disciplinary referral letters to the Parent, informing her

of S.E.'s suspension for skipping class or detention, Pet. Ex. 17, 18, 19.

S.E.'s disciplinary record shows increasingly disturbing behavior in seventh grade (notwithstanding testimony by Melinda Theis, Assistant Superintendant of Schools that "nothing in this behavior indicates a student who did not belong at [the middle school]" and "this behavior is not uncommon at a middle school"). School's Statement of Disputed Facts ¶ 22. In fact, according to the record, S.E.'s misconduct included pinching a male student's buttocks; saying she would get a gun and shoot another student; striking that student with her purse; and slapping another student in the face hard enough to leave a red mark. PSUF ¶ 22. After S.E., while attending seventh grade at a different middle school, stole another girl's pocketbook and iPod, the Parent decided not to return S.E. to the public middle school for eighth grade because S.E. was continuing to express threats to hurt the girl. PSUF ¶ 31, 35.

As a result of her behavior in school, S.E. had to be removed from the class room on occasion and/or was given detention or other disciplinary measures. In sum, while the record reflects that there are particular difficulties in the relationship and interaction S.E. has with her mother, S.E.'s difficulties and troubling conduct were not limited to the home setting. Moreover, the clinical psychologist engaged by the School agreed "that [S.E.'s] overall performance is impacted by her psychiatric status

and that she would do better as her psychiatric status improved."
Decision 9, Pet. Ex. 56 at 6.

The School also suggests that neither of S.E.'s treating psychiatrists testified "that the residential placement was in order to make educational progress." School Mem. 19. However, a review of Dr. Wilberger's and Dr. Picotte's testimony shows otherwise. Dr. Wilberger stated that, "part of the reason [S.E.] needs residential care is that she can't function adequately at home or at school . . . There's also been multiple disruptions in her education because of these psychiatric difficulties, because of those problems, and she's going from program to program and that forces changes in her education." Hr'g. Tr. III 100:4-20. When specifically asked by the Hearing Officer whether S.E.'s psychiatric needs were such that they would impair her ability to learn, Dr. Wilberger responded that "[i]f [S.E.] were in a proper program where her acting-out behaviors could be contained . . . then she could learn." Id. at 101: 9-17. Further, Dr. Wilberger expressed his concern regarding S.E.'s ability to hold down a job and her general functioning in the future and that S.E.'s "education is being disrupted by the psychiatric disorder. But is she capable of learning, I think that she is. The primary need is for the residential care, in my opinion." Moreover, in his written opinion, Dr. Wilberger states unequivocally that "if [S.E.] is to make reasonable educational progress [S.E] needs a highly structured therapeutic residential placement." Pet. Ex. 30 at 2.

33

In the same vein, Dr. Picotte concluded that "S.E. is incapable of making reasonable academic or emotional progress in any setting other than residential placement at this time." Pet. Ex. 55 at 2. Dr. Picotte stated at the Hearing that S.E.'s "escalating behaviors over the course of several years, despite intensive treatment efforts . . . suggest to me that she needs a more structured environment, residential treatment where she can receive her services on an ongoing basis on site." Hr'g Tr. V 37:21-38:2. Dr. Picotte also testified that S.E. "did very well in our highly structured program" and she agreed that that was needed for S.E.'s ability to participate in an educational environment. Hr'g Tr. V 40:10-20. When asked by the Hearing Officer to explain her opinion, Dr. Picotte stated that

> "what [S.E.] brings to the educational environment
> is not limited to just the educational environment.
> [S.E.] brings her difficulty modulating affect wherever
> she goes. And in order to assist her in learning, how to
> accomplish that better, it's important that she's being
> coached in each of her settings, including when she goes
> home on passes with her mother, that her mother is aware
> of the plan and her mother is coaching in similar ways.
> I mean, certainly [S.E.] is a bright girl and nobody
> argues with that, and that in turn will actually help her
> prognosis. But I think that it's very important for her
> to have the same highly structured environment across the
> realm." Hr'g Tr. V 40: 17-41:13.

In sum, both treating psychiatrists stated at the hearing and in writing that S.E. required residential placement in order to make educational progress. Although the School maintains that S.E. "has been able to be successful in all of her school settings and

does not need a residential placement to be educated," School Mem. 18, it has submitted no evidence that would support such a contention. On the contrary, every program the School has made available to S.E. has consistently failed to forward S.E.'s academic progress. Although S.E. agreed to work with the English teacher after school, S.E. never followed through. PSUF ¶ 45. S.E.'s enrollment in East Bay Career Academy lasted no more than three weeks. PSUF ¶ 128. There is no evidence that, during the three weeks S.E. attended the School's Extended Day Program, S.E. actually did any work. PSUF ¶ 138-141. Similarly, it is unclear why S.E. received certain credits for the Freshman Credit Recovery Program, as she apparently did not meet the admission criteria and also exceeded the limit for absences. PSUF ¶ 151-156. S.E. also failed the subsequent Survival Skills for High School Class. PSUF ¶ 159. Based on that evidence, the Hearing Officer was well within his discretion to give no deference to the School's position that S.E. has the ability to make progress within the school setting and that she can be successful at Mt. Hope High School. School Mem. 21, 23.

In light of the undisputed facts in this case and the testimony and the exhibits submitted in the administrative record, the Court is of the opinion that the School has not met its burden to establish that the Hearing Officer's determination was erroneous regarding the need for residential placement of S.E. in order to

comply with the mandate of IDEA.

2.   Award for Compensatory Education

A student who has been deemed eligible for special education services under the IDEA "may be entitled to further services, in compensation for past deprivations." Maine Sch. Admin. Dist. No. 35 v. Mr. and Mrs. R., 321 F.3d 9, 17-18 (1st Cir. 2003); Pihl v. Mass. Dept. of Educ., 9 F.3d 184, 188-189 ("[C]ompensatory education is available to remedy past deprivations."). A student is considered deprived of the appropriate education guaranteed by IDEA, "[w]hen an IEP fails to confer some ( i.e. more than de minimis) educational benefit to a student." M.C. on Behalf of J.C. v. Cent. Reg'l Sch. Dist., 81 F.3d 389, 398 (3d Cir. 1996). The right to compensatory education accrues from the point that the school district knows or should know of the IEP's failure. Maine Sch. Admin. Dist. No. 35 v. Mr. and Mrs. R., 321 F.3d at 17-18 ("[C]laim for compensatory education begins to accrue when his or her IEP is so inappropriate that the child is receiving no real educational benefit.")(citing M.C. on Behalf of J.C. v. Central Reg'l Sch. Dist., 81 F.3d at 396.)

With respect to the award for compensatory education, the School maintains that (1) S.E. received between one and one half and two hours daily academic instruction while she was an inpatient at Butler; (2) while participating in the PHP, S.E. refused offered services through the Extended Day program; and (3) S.E. was

enrolled in the summer credit recovery program to make up for lost academic time. School's Mem. at 24. The Parent, on her part, asserts that the education services provided to S.E. were "inappropriate no later than January 2009"[10] and that the School should have proceeded with an evaluation of S.E.'s special needs and the drafting and implementation of an appropriate IEP. Parent's Mem. 69.

The Hearing Officer's determination that S.E. is entitled to 21 weeks of compensatory education is well supported by the undisputed facts in this case. Even prior to S.E.'s admission to Butler, the Parent requested an IEP for S.E., to which the School failed to respond. PSUF ¶¶ 61-62. During S.E.'s stay at East Bay's PHP, she received no academic instruction of any kind. PSUF ¶ 58. Once S.E. was admitted to Butler, her academic instruction was limited to one and one-half to two hours per day that the hospital arranged through a private agency. PSUF ¶ 112. Although the School paid for the private instruction, there is no evidence that anyone from the School ever communicated with Butler or the private agency that provided the instruction. PSUF ¶ 113, SSUF ¶ 113. It is also undisputed that the School did not record any

_____

[10]

At that time, the Parent had delivered to the School Dr. Picotte's assessment that S.E. was "incapable of making reasonable academic or emotional progress in any setting other than residential placement at this time," Pet. Ex. 55, and the School had held a first "Referral Meeting." See supra.

grades or credits for S.E. for the private instruction she received while at Butler. PSUF ¶ 115. For those reasons, the Hearing Officer was well within his discretion to determine that S.E. had "lost the full value of an academic school experience during her stay at Butler," and to award to S.E. compensatory education from December 4, 2008 through March 17, 2009 less the Christmas period. Decision at 10.

Although it is correct that S.E. did not participate in the Extended Day Program offered to her while she was in the PHP, the evidence presented to the Hearing Officer offered a plausible explanation. In a letter signed by East Bay's Children's Manager Patricia A. Arel ("Arel") and Dr. Wilberger, the School was informed on November 22, 2008 that S.E. "was exhausted by the end of the PHP program daily and alternate accommodations may be needed to support her academics. If tutoring is available, this may be a support that would have success as [S.E.] is behind in all her classes." Pet. Ex. 28. At the hearing, Arel further explained that she was concerned that "there would be an after school program or something [S.E.] would be attending, but [S.E.] could barely hold it together during the PHP program. So, then, if she would go to something after that, my concern was that she would lose control." Hr'g Tr. III 37:18-38:5.

With respect to the Freshmen Credit Recovery Program, the progress report for Session I reveals that, in the second week,

S.E.'s "attitude was somewhat defiant, leading to her being removed from the classroom and suspended the following day (She refused to turn in her phone after texting and escalated to using profanity.)" In the third week, S.E. attended only two full days of English instruction after being one and three quarter hours late on two days and absent on a third; inexplicably, the School assigned her full credit for the subject. Pet. Ex. 32.

Finally, as noted by the Hearing Officer, several weeks elapsed after S.E.'s discharge from Butler until she was enrolled in the East Bay Career Academy and, after S.E. left the Career Academy, there was an additional two week period without instruction before S.E. started attending the Extended Day Program. Decision 10, PSUF ¶¶ 122, 124.6. During the entire process and through the end of the Independent Due Process Hearing, the School maintained its position that S.E. was not disabled and did not qualify for special education and related services.

Based on those undisputed facts, and in the absence of any evidence that the School fashioned and implemented an appropriate IEP for S.E. during the time periods in question, the Court is of the opinion that the School has failed to establish that the Hearing Officer's award of compensatory education was in error. Therefore, the School's appeal of the Hearing Officer's Decision is denied and the award of 21 weeks of compensatory education is upheld.

D. Attorney's Fees

Under the IDEA, the parent of a child with a disability, who prevails in the administrative proceeding or litigation related to a due process hearing, may be entitled, in the discretion of the Court, to reimbursement of reasonable attorney's fees. 20 U.S.C. § 1415(i)(3)(B)(i)(I);[11] Smith v. Fitchburg Pub. Sch., 401 F.3d 16, 22 (1st Cir. 2005)(IDEA provides recovery of reasonable attorney's fees to prevailing party in the court's discretion). "[A] prevailing party is any party who 'succeed[s] on any significant issue . . . which achieves some of the benefits plaintiffs sought in bringing suit." Maine Sch. Admin. Dist. No. 35 v. Mr. and Mrs. R., 321 F.3d at 14. A party in a proceeding or law suit related to IDEA is considered "prevailing" when there is a "material alteration of the legal relationship of the parties" as well as "judicial imprimatur on the change." Smith v. Fitchburg Pub. Sch., 401 F.3d at 22 (quoting Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001)). Such "judicial imprimatur" includes an administrative hearing involving a hearing officer. Smith v. Fitchburg Pub. Sch., 401 F.3d at 22 n. 9.("[F]or purposes of the IDEA, a party may 'prevail' in an administrative hearing - thus the

---

[11] 20 U.S.C. § 1415(i)(3)(B)(i)(I) provides, in pertinent part:
In any action or proceeding under this section, the court, in its discretion, may award reasonable attorney's fees as part of the costs . . . to a prevailing party who is the parent of a child with a disability.

appropriate involvement of a [state educational agency] hearing officer can provide the necessary 'judicial imprimatur.'").

The Parent's complaint seeks (1) reimbursement of $77,370 in attorney's fees and costs which the Parent incurred in connection with the Due Process Hearing, and (2) the costs of this action, including attorney's fees. In her motion for summary judgment, the Parent submits that, because she and her daughter are the prevailing parties in this matter, they should be awarded reasonable attorney's fees. As the Parent points out, the School has now stipulated that S.E. is a child with a disability and, therefore, she is eligible for special education services. At this time, the Parent's request is limited to seeking a ruling that she and her daughter are the prevailing parties and to reserve the right to file a motion for attorney's fees once the Court has determined the School's appeal of the Hearing Officer's Decision. Parent Mem. 70. The School, on its part, has taken no position in its memoranda regarding the Parent's request for reimbursement of attorney's fees.

In light of this Court's determination denying the School's appeal of the Hearing Officer's Decision and affirming that Decision in its entirety, the parties are directed to submit, within 30 days of this Memorandum and Order, legal memoranda addressing their respective positions on the matter of attorney's fees. Counsel are reminded, as well, to comply with the provisions

in Local Rule LR Cv 54.1.


SO ORDERED.


_____ Mary M. Lisi _____
Mary M. Lisi
Chief United States District Judge

December 1 , 2010